

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHRISTOPHER P. ADAMS                         CIVIL ACTION

VERSUS                                       NO: 01-3803

CLYDE J. PHILLIPS, III, ET                   SECTION: "J"(5)
AL.

### ORDER AND REASONS

Before the Court is Defendant Clyde Phillips' **Motion for New Trial and Remittitur** (Rec. Doc. 52) which was set for a hearing on the briefs on November 20, 2002. Plaintiff Christopher Adams has filed a memorandum in opposition (Rec. Doc. 59). After considering the memoranda submitted by counsel, the record, and the applicable law, the Court concludes that Defendant's motion should be **DENIED**.

### BACKGROUND

In December 2001, Plaintiff Christopher Adams (Adams) filed suit against Defendants Clyde Phillips, III (Phillips) and KA-C Properties, LLC (KA-C), asserting claims under the Federal Fair Credit Reporting Act (FCRA), 15 U.S.C. §§1601-1693r, and Louisiana



DATE OF ENTRY

DEC 19 2002

state law.  The lawsuit arises out of the actions taken by Phillips on two separate days, September 5, 2001 and December 12, 2001.  On September 5, 2001, Phillips, without authority, obtained from Equifax, a consumer credit reporting agency, a consumer credit report on Adams.  Phillips obtained and subsequently used the report for the purpose of causing Adams financial and emotional harm.  Then, on December 12, 2001, Phillips impersonated Adams for the purposes of obtaining a fraudulent driver's license of Adams.  On that same day, Phillips used the fraudulent driver's license in order to impersonate Adams at three local retail stores.  Using the fraudulent license and representing himself as Adams, Phillips caused the stores to obtain credit reports on Adams from Equifax, which were used to open lines of credit and purchase merchandise in Adams' name.  Phillips sought to open the credit accounts for the purpose of further injuring Adams' credit reputation and causing him emotional harm.

The trial of this matter came before the Court on October 7 and 8, 2002.  Over the objection of defense counsel, the Court instructed the jury that the FCRA applied to the actions taken by Phillips on both days.[1]  The Court also excluded the testimony of Leo Kern, Adams' accountant.  After hearing all of the witnesses and evidence and deliberating, the jury returned a verdict in favor

---

[1] Defense counsel only objected to the application of the FCRA to Phillips' actions on December 12, 2001.  Phillips admitted, prior to trial, that he acted in violation of the FCRA on September 5, 2001.

of Adams finding that Phillips acted willfully under the FCRA, when he obtained Adams' credit report without authorization and when he applied for credit in Adams' name. The jury awarded Adams the following damages:

COMPENSATORY DAMAGES

| | |
|---|---|
| **Past Economic Loss** | $150,000 |
| **Future Economic Loss** | $50,000 |
| **Past General Damages** | $20,000 |
| **Future General Damages** | $5,000 |

PUNITIVE DAMAGES

| | |
|---|---|
| **Phillips' Conduct on September 5, 2001** | $150,000 |
| **Phillips' Conduct on December 12, 2001** | $125,000 |

Included in the general damages were injury to credit reputation, humiliation, embarrassment, inconvenience, and mental anguish.

Phillips now moves for a new trial and/or remittitur on four separate grounds:

I) The compensatory damages award is against the great weight of the evidence presented at trial.

II) The punitive damages award for Phillips' actions on September 5, 2001 is constitutionally excessive.

III) The Court erred in instructing the jury that the FCRA applied to Phillips' actions on December 12, 2001. As such, punitive damages should not have been awarded for Phillips' actions on that date.

IV) The Court erred in excluding the testimony of Leo Kern, a proposed defense witness.

3

**DISCUSSION**

I. Compensatory Damages in Light of the Evidence Presented at Trial

Federal Rule of Civil Procedure 59(a) provides that a district court may grant a new trial

> to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

New trials are not to "be granted on evidentiary grounds unless, at a minimum, the verdict is against the great weight of the evidence." Dawson v. Wal-Mart Stores, 978 F.2d 205, 208 (5th Cir. 1992). In considering a Rule 59(a) motion, a district court must "respect the jury's collective wisdom and must not simply substitute its opinion for the jury's." Smith v. Transworld Drilling Co., 773 F.2d 610, 613 (5th Cir. 1985). However, if the court is not satisfied with the jury's verdict, it has a duty to set the verdict aside and order a new trial. Id.

Depending on the circumstances of the case, a district court has the option of either granting a new trial or a remittitur on the issue of damages. See Brunnemann v. Terra Int'l, Inc., 975 F.2d 175, 178 (5th Cir. 1992). "[W]hen a jury verdict results from passion or prejudice, a new trial, not remittitur is the proper remedy." Id. However, a damage award that exceeds the "bounds of any reasonable recovery" is subject to remittitur, not a new trial.

4

Id. The size of the remittitur is determined by the "maximum recovery rule" which dictates that the "verdict must be reduced to the maximum amount the jury could properly have awarded." Id.

Phillips argues that the evidence presented at trial could not possibly support the jury's $200,000 award for past and future economic losses. Phillips further contends that the jury was horrified by his actions taken against Adams and responded with a verdict motivated by passion and prejudice. As a result, the jury's award far exceeds the pecuniary damages actually suffered by Adams. Phillips believes that he is thus entitled to a new trial on the issue of compensatory damages, or alternatively, asks the Court to remit a portion of Adams' economic loss damages to represent an amount reasonably supported by the evidence produced at trial.

In order to prove the amount of his economic loss damages, Adams testified that his access to credit was severely damaged as a result of Phillips' actions. Consequently, Adams testified that he is personally responsible for a $271,000 loan incurred by a corporation in which he is part-owner along with Ron Bordelon. Adams also testified that his damaged credit reputation has prevented him from carrying on his construction business in which he was earning more than $100,000 a year. Adams additionally testified that his construction business has still not fully recovered from the damage suffered due to Phillips' actions. Lastly, Adams testified that he also lost an opportunity to make a

$35,000 profit on the purchase and sale of a condominium in Florida.

A review of Adams' testimony supports the finding that the jury's verdict in regards to compensatory damages was not against the great weight of the evidence produced at trial. While it is true that much of Adams' testimony was not corroborated by any documentary evidence, the jury was entitled to base its determination on the credibility of Adams as a witness. The jury clearly chose to give tremendous weight to Adams' testimony concerning the actual damages that he suffered and will suffer in the future. As such, the jury believed that Adams' knowledge of both the local construction industry and the effect that his damaged credit reputation had on his ability to continue in the industry was sufficient to justify a $200,000 economic damages award.

The Court does not find that the jury acted unreasonably, especially in light of the much smaller award for general damages. If the jury had been truly motivated by passion and prejudice, it would have likely awarded a much larger amount in general damages. The jury's restraint supports the finding that the compensatory damages award is based on legally sufficient evidence. Thus, neither a new trial nor a remittitur is warranted on this issue.

II. <u>The September 5, 2001 Punitive Damages Award</u>

In <u>BMW of N. Am., Inc. v. Gore</u>, 517 U.S. 559, 575-86, 116 S. Ct. 1589, 1598 (1996), the Supreme Court set out three factors that

guide courts in considering whether a punitive damages award is constitutionally excessive. The three factors are: (1) the defendant's reprehensibility or culpability; (2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and (3) the sanctions imposed in cases for comparable misconduct. Id.

A. Reprehensibility

The Supreme Court considers the degree of reprehensibility to be "the most important indicium of the reasonableness of a punitive damages award." Id. at 575, 116 S. Ct. at 1599. This factor depends on both "the nature of the conduct itself and the context in which it occurred." Watson v. Johnson Mobile Homes, 284 F.3d 568, 572 (5th Cir. 2002). A court is to look to where the defendant's conduct "fits on a scale of outrageousness." Id. A wrongful action that is part of a larger pattern of misconduct is more reprehensible than an isolated action. Id. Likewise, purposeful actions such as trickery and deceit are more reprehensible than mere negligence. Id. Violence or a threat of violent conduct is frowned upon more than conduct which causes only economic harm. Id.

Phillips argues that his actions on September 5, 2001 were more foolish than reprehensible. Phillips claims that he accessed Adams' credit report, without authorization, in order to protect the business interests of Ron Bordelon, a business partner of both Adams and Phillips. Phillips thus argues that his actions were not

reprehensible because he was helping to protect a partner's legal interest in a piece of property, not to cripple Adams' financial stability.

Phillips may characterize his actions as "foolish", however taken in context with his actions on December 12, 2001, the Court concludes that they show a pattern of brazen misconduct, based on trickery, fraud, and deceit. Phillips appears to have purposefully taken actions which would damage Adams' credit reputation; a path which would most assuredly lead to the financial downfall of Adams, a construction contractor. The fact that Phillips' actions were not violent is outweighed by the level of reprehensibility involved. Taken as a single event, Phillips' actions on September 5, 2001 probably do not merit a $150,000 punitive damages award. However, looking at the entirety of his actions towards Adams shows that Phillips' conduct was extremely reprehensible and thus serves as reasonable grounds for the jury's punitive damages award.

B. <u>Relationship Between the Punitive Damages and Compensatory Damages Award</u>

The second factor in <u>BMW</u> evaluates the ratio between the punitive damages award and the actual or potential harm suffered by the plaintiff. <u>BMW</u>, 517 U.S. at 580, 116 S. Ct. at 1601; <u>Watson</u>, 284 F.3d at 573. There is no particular point at which the discrepancy between punitive and actual damages is so great that a punitive damages award will automatically be declared unconstitutional. <u>BMW</u>, at 583, 116 S. Ct. at 1602; <u>Watson</u>, at 573.

In <u>BMW</u> however, the Supreme Court called a 500:1 ratio "breathtaking." 517 U.S. at 583; 116 S. Ct. at 1603. In <u>Watson</u>, the Fifth Circuit held that a 175:1 ratio was clearly excessive, yet still only remitted a portion of the award to reflect a 37½:1 ratio. 284 F.3d at 574. In <u>Rubinstein v. Adm'rs of the Tulane Educ. Fund</u>, 218 F.3d 392, 408 (5th Cir. 2000), the Fifth Circuit under the facts of the case held that a punitive damages award thirty times the actual damages was excessive, yet still only remitted a portion of the award to reflect a 10:1 ratio.

Phillips argues that several cases in which federal circuit courts interpret the FCRA show that the September 5, 2001 punitive damage award was excessive. <u>See</u> <u>Bakker v. McKinon</u>, 152 F.3d 1007 (8th Cir. 1998)(affirming a punitive damages award of $5,000 in light of a $500 actual damages award); <u>Yohay v. Alexandria Employees Credit Union, Inc.</u>, 827 F.2d 967 (4th Cir. 1987)(affirming a $10,000 punitive damages award in light of no actual damages). Phillips' argument is based on the quantum of the damages and not on the relationship between the punitive and actual damages awards in those cases. The Supreme Court has instructed that it is the ratio between the two sets of damages which is important. In the instant case, the ratio between the September 5, 2001 punitive damages award and the total compensatory damages awards is actually less than 1:1 ($150,000 to $225,000)[2]. This is

---

[2] Comparing the punitive damages award to various fractions of the total compensatory damages award still creates a ratio

9

a far cry from the ratio in BMW or the two federal circuit cases cited by Phillips. Thus, the second BMW factor also leans in favor of upholding the September 5, 2001 punitive damages award.

C. Sanctions Imposed in Cases with Similar Misconduct

Under this third factor, a district court must consider the penalties imposed under state law for similar misconduct. Watson, 284 F.3d at 573. The Supreme Court in BMW instructed lower courts to "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." 517 U.S. at 583, 116 S. Ct. at 1603 (internal quotations and citations omitted). Louisiana does not have a similar statutory scheme to the FCRA. However, Louisiana has enacted consumer protection statutes in several areas. The Louisiana Consumer Credit Law, LA. R.S. §9:3510-3577.5, regulates consumer credit transactions. Where a court concludes that an extender of credit has intentionally or as a result of an error not in good faith violated this statutory scheme, the consumer has the right to recover three times the amount of the loan finance or credit service charge. LA. R.S. §9:3552(A)(1)(a). The Louisiana Unfair Trade Practices and Consumer Protection Law, LA. R.S. §51:1401-1420, also provides protections to consumers. A consumer is entitled to three times her actual damages where a court finds that an unfair or deceptive trade method was knowingly used by the defendant. LA. R.S.

---

short of those ratios approved of in Watson and Rubinstein.

10

§9:51:1409(A).

In the instant case, Adams was awarded $150,000 in punitive damages as a result of Phillips' actions on September 5, 2001. This is less than the $225,000 in total compensatory damages awarded Adams for the events of both September 5, 2001 and December 12, 2001. The punitive damages awarded in this case are no more extreme than the treble damage schemes available under the Louisiana consumer protection statutes. Thus, a Louisiana defendant acting in willful violation of the FCRA as a result of fraudulent and deceitful conduct should be on notice of the availability of potentially large punitive damage awards.

Since the three BMW factors as applied to this case show that the punitive damages award was not excessive, the Court denies Phillips' request for either a new trial or a remittitur on the issue of punitive damages.

III. Whether the Court Erred in Instructing the Jury that the FCRA Applied to Phillips' Actions on December 12, 2001

Phillips next argues that the FCRA is inapplicable to his December 12, 2001 conduct. Since punitive damages are only available to Adams under the FCRA, Phillips contends that the Court erred in instructing the jury that punitive damages could be awarded for Phillips' conduct on that date. During the trial, the Court rejected a similar argument made by Phillips. The Court now sees no reason to reconsider its ruling.

15 U.S.C. §1681n creates civil liability for a person's

11

willful noncompliance with the FCRA. The FCRA forbids a person from using or obtaining a consumer report for any purpose unless the report was obtained for a permissible purpose. 15 U.S.C. §1681b(f)(1). §1681b(a)(3)(A)-(F) sets forth an exclusive list of six permissible purposes that a person must have in obtaining a report. The person must intend to use the information contained in the report (1) in connection with a credit transaction involving the consumer, (2) for employment purposes, (3) in connection with the underwriting of insurance involving the consumer, (4) in connection with a determination of the consumer's eligibility for a license or benefit granted by a governmental instrumentality, (5) for assessment of the risks associated with an existing credit obligation, or (6) for other legitimate business needs. Id.

A natural person may also incur civil liability under §1681n(a)(1)(B) for obtaining a consumer report under false pretenses or knowingly without a permissible purpose. §1681q creates a third provision for liability under the FCRA. §1681q provides that "[a]ny person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses shall be fined under Title 18, imprisoned for not more than 2 years, or both." This provision has been interpreted to form a basis for civil liability under the FCRA. Hansen v. Morgan, 582 F.2d 1214 (9th Cir. 1978). When a person willfully fails to comply with any requirement that protects consumers under the FCRA, that person may be liable to the consumer for "such

amount of punitive damages as the court may allow." §1681n(a)(2).

Phillips argues that on December 12, 2001, he never "used" or "obtained" a consumer credit report on Adams as the terms are applied in the FCRA. He contends that at most, he caused the retail stores to obtain and use Adams' credit reports. Under Phillips' interpretation of the FCRA, his actions do not violate any of the consumer protection provisions contained in the statutory scheme. As support, Phillips defines a "user" of a consumer credit report under the FCRA as "the ultimate destination of a credit report as well as the person who acquires (a credit report) for another." See Yohay v. Alexandria Employees Credit Union, 827 F.2d 967, 973 (4th Cir. 1987)(citing Boothe v. TRW Credit Data, 557 F. Supp. 67, 71 (S.D.N.Y. 1982)).

The Court agrees that the term "user" includes both of these definitions. However, this is not an exclusive definition of user, nor does it fully define a person who "obtains" a credit report under the FCRA. In Yohay, the Fourth Circuit held that an employee of a credit union was a "user" under the FCRA when she used her company's contract with a credit reporting agency to obtain a credit report on her ex-husband for personal purposes. Id. at 969. The Fourth Circuit rejected the employee's argument that she was not a "user" because she was acting as an employee of the credit union. Id. at 973. The court held that she was a "user" under the FCRA because she was the "ultimate destination" of the report. Id. Thus, the Fourth Circuit created a definition of "user" that

13

directly applied to the factual circumstances before the court at that time. However, the court in <u>Yohay</u> did not face the same factual circumstances present in the instant case.

To have "used" or "obtained" a credit report under the FCRA, Phillips need not have personally requested the report from the reporting agency. <u>See</u> <u>Phillips v. Grendahl</u>, 2002 WL 31718984 (8th Cir. 2002)(holding that as a matter of law, a defendant who did not personally request a consumer credit report from a reporting agency could still be a "user" under the FCRA if she asked a third party to make the request). It is enough that his deceitful and fraudulent conduct was the sole cause for issuance of Adams' credit reports to the retail stores. Phillips, in impersonating Adams, consented in the stores' request of Adams' reports from the reporting agency. The stores would never have obtained and used the reports absent consent and were it not for their belief that Phillips was Adams. By fraudulently requesting that the retail stores obtain the reports on Adams, Phillips "used" the reports in order to obtain a benefit, namely the lines of credit. By obtaining these lines of credit, Phillips was able to begin carrying out his plan to further damage Adams' credit and community reputations. These clearly are not permissible purposes under the FCRA.

The Court thus concludes that Phillips' conduct satisfied the civil liability requirements under the FCRA. Thus, the Court properly instructed the jury as to the availability of punitive

damages for Phillips' actions on December 12, 2001.

IV. <u>Whether the Court Erred in Excluding the Testimony of Leo Kern</u>

During the trial, the Court excluded the testimony of Leo Kern. In his motion and memorandum, Phillips fails to raise any new arguments on this issue. Thus, the Court sees no reason to reverse its ruling in excluding the testimony of this witness.

## CONCLUSION

Phillips fails to show why any portions of the jury verdict should be overturned or that any of the Court's legal determinations should be reversed.

Therefore;

It is **HEREBY ORDERED** that Phillips' Motion for New Trial and Remittitur (Rec. Doc. 52) is **DENIED**.

New Orleans, Louisiana, this 19 day of December, 2002.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE

15